UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

KATRINA LYNN CAUDILL,

       Plaintiff,

v.                                        Civil Action No. 2:08-1202

CCBCC, INC.,
a corporation,

       Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

      Pending is the motion for summary judgment of the defendant, CCBCC, Inc. ("CCBCC"), filed on June 15, 2009.[1]   For the reasons that follow, the motion is granted.

I.

      A bottler and distributor of Coca Cola products, CCBCC is a Delaware corporation with its principal place of business in Charlotte, North Carolina.  (Compl. ¶ 1; Answer ¶ 1; Not. of Removal ¶ 7).  In September of 2001, CCBCC hired the plaintiff, Katrina Caudill, as a "truck checker" at its Logan, West Virginia

---

[1] While the complaint names CCBCC, Inc. as the defendant, it appears that the official name of the defendant is Coca-Cola Bottling Co. Consolidated, Inc.  (Answer at 1).

1

facility. (Caudill Dep. at 28-29, Mot. Summ. J., Ex. 2).

Plaintiff, who is a Logan, West Virginia resident, worked as a

truck checker until January of 2002 when she was promoted to the

position of warehouse manager.  (Compl. ¶ 2; Caudill Dep. at 30,

Mot. Summ. J., Ex. 2).[2]  As warehouse manager, plaintiff was the

immediate supervisor of three warehouse employees.  (<u>Id.</u> at 31).

While the employees she supervised were part of a union, and

governed by a union contract, as a warehouse manager she was not.

(<u>Id.</u> at 32).  In addition to not being part of the union,

plaintiff was not party to an employment contract with CCBCC.

(<u>Id.</u> at 38).

---

[2] It is unclear when plaintiff was promoted to warehouse
manager.  Suffice it to say that the plaintiff has given various
dates in the year 2002 when she began to serve CCBCC in that
capacity and CCBCC has provided evidence that it was either in
2002 or 2005.  Neither the date plaintiff became employed by
CCBCC, nor the date of her promotion, bear on the merits of
CCBCC's motion for summary judgment.

CCBCC's "Employment Guide" contains, what the parties refer to as, an "anti-nepotism" policy.  Under the heading "Employment of Relatives," the Employment Guide provides:

CCBCC does not believe it is in the best interest of the Company to employ relatives of employees of the Company.  CCBCC will avoid hiring "close relatives." "Close Relatives" are defined as the employee's:

| | | | |
|---|---|---|---|
| Spouse | Stepson | Mother-in-law | Nephew |
| Children | Step-daughter | Father-in-law | Niece |
| Father | Step-Father | Sister-in-law | Uncle |
| Mother | Step-Mother | Brother-in-law | Aunt |
| Sister | Step-Sister | Daughter-in-law | Grandparents |
| Brother | Stepbrother | Son-in-law | Grandchildren |
| Cousin | Legal Guardian | | |

A.  Promotion into Supervision - In situations where employees are promoted into supervision where they have a close relative working, (i.e. grandfathered acquisitions) the relative will be transferred within a reasonable period of time

B.  Exceptions to this policy include:
   1.  Hiring close relatives for temporary work assignments (e.g., summer employment)
   2.  Weekend merchandisers

(CCBCC Employment Guide at 87-88, Reply to Resp. to Mot. Summ. J., Ex. 1).[3]  When plaintiff was hired by CCBCC, she received a

---

[3] Under the heading "Marriage of Employees" the Employment Guide provides further that:

The Company does not permit the continued employment of both employees upon marriage.
Two employees who decide to marry must decide which of them will resign his/her employment within 30 days of the marriage.  The supervisor of each employee must be notified by each employee of that decision.  This policy shall apply to all regular full-time employees.

(CCBCC Employment Guide at 87, Reply to Resp. to Mot. Summ. J.,

3

copy of the Employment Guide, and was aware of the employment of relatives policy set forth therein.  (Caudill Dep. at 37-42, Mot. Summ. J., Ex. 2).

CCBCC has submitted the affidavit of Lynn Leary, the company's employee relations manager since January 1, 2000. (Leary Aff. ¶ 1, Mot. Summ. J., Ex. 4).  As employee relations manager, Ms. Leary is responsible for overseeing employee and labor relations for all CCBCC facilities, including its facilities in Logan, West Virginia, and for administration of the personnel policies set forth in the Employment Guide.  (Id. ¶ 2). Ms. Leary's affidavit states that the employment of relatives policy contained in the Employment Guide "disallows the employment of close relatives, except in the role of weekend merchandisers who are exempt from the application of the policy. In practice, close relatives are forbidden from working together where the appearance of impropriety or a conflict of interest might occur."  (Id. ¶¶ 4-5).  According to Ms. Leary, the statement in the Employment Guide that "'CCBCC does not believe it is in the best interest of the Company to employ relatives of employees or directors of the Company,' means that the business necessity behind CCBCC's anti nepotism policy is to avoid the

Ex. 1).

4

appearance of impropriety within the line of supervision and the potential of a conflict of interest." (Id. ¶ 10).[4]  Because the purpose of the policy is to "eliminate favoritism and to remove the opportunity for favoritism . . . [i]n its practical application, the Employment of Relatives policy effectively disallows the supervision of one relative by the other." (Id. ¶¶ 6-7).  Thus, according to Ms. Leary, "there are multiple examples of family members who work within the same department and/or the same CCBCC branch without violating the policy because neither

---

[4] The employment of relatives policy is found on pages 87 through 88 of the Employment Guide, and each party has submitted copies of those pages. (Employment of Relatives Policy, Mot. Summ. J., Ex. 3; Employment of Relatives Policy, Resp. to Mot. Summ. J., Ex. B).  CCBCC has also submitted a copy of the Employment Guide, which includes the employment of relatives policy at pages 87 through 88.  (CCBCC Employment Guide at 87-88, Reply to Resp. to Mot. Summ. J., Ex. 1)  The language purportedly quoted from the Employment Guide in Ms. Leary's affidavit includes "directors" as a class of personnel falling within the employment of relatives policy.  Yet, the words "or directors of" is not included in the copy of the Employment Guide or the copies of the employment of relatives policy provided by the parties.  (Employment of Relatives Policy, Mot. Summ. J., Ex. 3; Employment of Relatives Policy, Resp. to Mot. Summ. J., Ex. B; CCBCC Employment Guide at 87-88, Reply to Resp. to Mot. Summ. J., Ex. 1).  Further, in CCBCC's memorandum in support of its motion for summary judgment CCBCC purports to quote the employment of relatives policy, but the quoted language differs from the language contained in the copies of the policy provided by the parties and from the copy of the Employment Guide provided by CCBCC.  (Mem. in Supp. Mot. Summ. J. at 2-3; Id.).  Inasmuch as the copies of the employment of relatives policy submitted by the parties and the copy of the Employment Guide submitted by CCBCC contain identical language, the court accept that language as the true reading of the employment of relatives policy.

5

relative is entrusted with the supervision of the other." (Id. ¶ 8).

In 2006 or 2007, plaintiff's daughter Hollie Cox began dating Roy Evans. (Caudill Dep. at 63, Mot. Summ. J., Ex. 2). Like the plaintiff, Mr. Evans worked for CCBCC, but was a member of the Chaueffers, Teamsters and Helpers Local Union No. 175. (Id. at 62). As a union member, Mr. Evan's employment with CCBCC was subject to the terms of a contract between the union and CCBCC. (Id. at 33; CCBCC/Local No. 175 Agreement, Mot. Summ. J., Ex. 6). When Ms. Cox and Mr. Evans first started dating, plaintiff was required to "check his [Mr. Evan's] trucks" and "verify Mr. Evan's deposits." (Caudill Dep. at 96, Mot. Summ. J., Ex. 2).[5] Once Mr. Evans and Ms. Cox began living together, however, Rick Thacker, the sales manager for the CCBCC Logan facility and plaintiff's superior, had another supervisor verify Mr. Evan's deposits in order to avoid allegations that the plaintiff was favoring her daughter's boyfriend. (Id. at 96-97).

In March of 2008, the plaintiff discovered that Mr.

---

[5] CCBCC states that at the outset of the relationship between Ms. Cox and Mr. Evans, Mr. Evans was employed by CCBCC as a "Route Salesman." (Mem. in Supp. Mot. Summ. J. at 5). While CCBCC offers no evidentiary support for this assertion, the plaintiff does not contest its accuracy.

Evans and Ms. Cox were considering getting married, (Id. at 59),
and at some point soon thereafter plaintiff learned that the
couple had set July 1, 2008 as the date for their marriage.
(Id.)  Because she had been told that if Mr. Evans and Ms. Cox
were to marry, her employment with CCBCC would be in jeopardy,
plaintiff informed Mr. Thacker of the impending marriage out of
concern for her job.  (Id. at 60-61).[6]

        At the time the plaintiff first spoke with Mr. Thacker
regarding her daughter's intention to marry Mr. Evans, Mr. Evans
was on workers compensation leave.  (Id. at 61-62).  As a member
of the union, upon returning to work Mr. Evans had a right under
the union contract to "bid into" a position in the warehouse.
(Id. at 62).  In the event Mr. Evans exercised this right, he
would be under the supervision of the plaintiff.  (Id.).
Plaintiff testified that:

        Q.   You were -- then you were discussing this with
             Rick [Thacker] and others in the facility, and you
             were being told that if Mr. Evans comes back to
             the warehouse, you would lose your job?
        A.   Yes.
        Q.   Per the policy?
        A.   Yes.

_____

        [6] It is unclear whether the plaintiff informed only Mr.
Thacker, or whether CCBCC route supervisor Greg Copley was also a
party to the conversation.  (Caudill Dep. at 60, Mot. Summ. J.,
Ex. 2).

                              7

(Id. at 85).  Despite knowing that plaintiff's job would be in jeopardy if he chose to come back to work in the warehouse, and though given the option to work in another position, upon returning to work Mr. Evans nevertheless chose to work in the warehouse.  (Id. at 64-71).  On April 14, 2008, following Mr. Evans' return to work, the plaintiff discovered that her daughter and Mr. Evans had changed their plans and intended to marry on the following day.  (Id. at 59).  On April 15, 2008, Mr. Evans and Ms. Cox were married, and plaintiff became the supervisor of her now son-in-law.  (Id.)

Following the marriage, plaintiff had a number of conversations with Mr. Thacker regarding the effect the marriage would have on her employment with CCBCC.  (Id. at 73).  And according to the plaintiff, Mr. Thacker "did everything in his power to keep my job."  (Id.).  Mr. Thacker told the plaintiff that he spoke with CCBCC auditors and human resources, and with "Doug Harper and Tom Smith."  (Id.)[7]  After these discussions, Mr. Smith told the plaintiff that, while she would be allowed to remain in her position for sixty days, after the sixty days she could no longer be employed as a warehouse manager at the CCBCC

---

[7] While the submissions of the parties do not reveal the job titles of Messrs. Harper and Smith, it is clear that they worked at CCBCC in a supervisory capacity.

8

Logan facility given that she now supervised her son-in-law.
(Id.)

According to the affidavit of Mr. Thacker, "[i]n an
effort to preserve Katrina Caudill's employment after learning
about the marriage of her daughter to her subordinate, CCBCC
offered Ms. Caudill an opportunity to transfer to the CCBCC
facility located in St. Albans, West Virginia." (Thacker Aff. ¶
5).  Had plaintiff accepted the offer, she would have been
transferred "to another Warehouse Supervisor position at the same
pay grade."  (Id. ¶ 6).  While this transfer was to be temporary,
"[b]y accepting the temporary transfer . . . Ms. Caudill would no
longer be in a direct line of supervision over her son-in-law Roy
'Bo' Evans."  (Id. ¶ 7).  Thus, according to Mr. Thacker, the
proposed transfer "would have been a way for all parties involved
to wait and see what happened without causing Ms. Caudill to lose
her job."  (Id. ¶¶ 6 and 8).  Plaintiff testified that while she
discussed the possibility of transferring to St. Albans on a
temporary basis with Mr. Smith, the warehouse manager working in
St. Albans told her that he would not transfer to Logan and
therefore the transfer never occurred.  (Caudill Dep. at 74-76,
Mot. Summ. J., Ex. 2).  Plaintiff also testified that even if the
St. Albans warehouse manager had been willing to transfer to

9

Logan, as counsel for CCBCC represented was the case, she could
not have accepted the transfer because her car was broken down
and she would not have been able to travel to St. Albans.  (Id.
at 76-79).

On July 18, 2008, CCBCC discharged the plaintiff.
(Compl. ¶ 4; Answer ¶ 4).[8]  On her last day of work, July 17,
2008, the plaintiff filled out a form titled "Exit Interview."
(7/17/08 Exit Interview Form, Reply to Resp. to Mot Summ. J., Ex.
9; Caudill Dep. at 88, Mot. Summ. J., Ex. 2).  On the form,
plaintiff checked boxes evidencing whether she was "very
satisfied," "satisfied," "dissatisfied" or "very dissatisfied"
with her employment experience at CCBCC.  As to thirteen out of
the fourteen "Aspects of Employment" inquired into, plaintiff
checked either the "very satisfied" or "satisfied" box.  (Id.)
Next to the aspect of employment titled "Company Policies,"
however, plaintiff checked the box marked dissatisfied.  (Id.)
In the comment portion of the form, plaintiff wrote, "[n]ot
satisfied with the company policy that cost me my job."  (Id.;
Caudill Dep. at 93-95, Mot. Summ. J., Ex. 2).

_____

[8] While plaintiff testified that Mr. Smith informed her
"that because your son-in-law now works under your supervision
you can't stay," (Caudill Dep. at at 73, Mot. Summ. J., Ex. 2),
it is unclear who ultimately informed the plaintiff that she
would be discharged.

10

During her deposition, the plaintiff was asked to explain the options that were available to CCBCC other than offering her a transfer, or ordering her discharge, given the company's policy regarding the employment of relatives.  (Caudill Dep. at 80, Mot. Summ. J., Ex. 2).  In response, plaintiff stated, "I didn't marry anyone.  Why shouldn't Mr. Evans be the one to have to leave the company?  I didn't marry him."  (Id. at 81).  The plaintiff then testified:

> Q.   You understand Mr. Evans is a union employee;
>      right?
> A.   I understand that.
> Q.   You understand that he had more seniority than
>      you; right?
> A.   I understand that.
> MR. WANDLING: Objection.  Seniority is not comparing
> apples with apples.  Only union people have seniority
> that matters.
> Q.   He had more seniority than you?
> A.   I would say so.  He still has a job.
> Q.   So the solution you wanted was Mr. Evans to be
>      moved?
> A.   Yes.
> Q.   Where?
> A.   I don't know.  Move him to Charleston.
> Q.   Do you know if there is an opening in Charleston?
> A.   I don't know.
> Q.   Any other solution?
> A.   I don't know.

(Id. at 81).  After testifying that Mr. Thacker, Mr. Smith and possibly others at CCBCC looked for ways to avoid her discharge, plaintiff stated that "I just don't think that it [the employment of relatives policy] should have applied to me."  (Id. at 82).

11

Soon after being discharged by CCBCC, the plaintiff
began looking for new employment, and on July 22, 2008 she
submitted a signed statement to "Workforce West Virginia."
(7/22/08 Workforce Statement, Mot. Summ. J., Ex. 5; Caudill Dep.
at 91, Mot. Summ. J., Ex. 2). The statement, which plaintiff
testified is accurate to the best of her knowledge, provides:

> I was employed by the above employer [CCBCC] from
> 9/12/02 to 7/18/08 as a warehouse manager, at
> approximately $22/hr.
>
> I was discharged by Tom Smith/Logistics supervisor for
> violation of a company policy.  The policy states that
> family members can not work together.
>
> On 4/15/08 my daughter, Hollie (Cox) Evans married Roy
> Evans. Roy is an employee with Coca Cola and I was his
> immediate supervisor.  The company said that family
> could not work together.  He has been there longer and
> is a union member.  For these reasons they said they
> had to let me go.
>
> I was aware of the policy.  The employer does have a
> handbook/written policy.  I did receive a copy when I
> first became employed.  I did not think it would apply
> to me because I did not marry anyone.
>
> I deny I did this.  I did not do anything, my daughter
> married an employee.
>
> I have not received prior written and/or verbal
> warnings concerning this or an [sic] anything else.  I
> have received numerous awards and have always had good
> evaluations.
>
> I was told that they could switch positions with
> another employee in the St[.] Albans, WV branch if he
> was agreeable to it and he was not, so there was no
> other position available for me to transfer into.

I am able, available and seeking full-time employment.
(7/22/08 Workforce Statement, Mot. Summ. J., Ex. 5; Caudill Dep.
at 91, Mot. Summ. J., Ex. 2).  In furtherance of her search for a
new job, plaintiff also created a resume.  (Resume, Reply to
Resp. to Mot. Summ. J., Ex. 8; Caudill Dep. at 90, Mot. Summ. J.,
Ex. 2).  In the resume, which plaintiff testified is accurate to
the best of her knowledge, plaintiff offered the following
explanation for why she was no longer employed by CCBCC: "Reason
for leaving:  My daughter married one of the other employees and
family cannot work together for the company.  He had been here
longer and was a union employee and I was the one that the
company had to let go."  (Resume, Reply to Resp. to Mot. Summ.
J., Ex. 8; Caudill Dep. at 90, Mot. Summ. J., Ex. 2).

On September 19, 2008, plaintiff commenced this action
by filing a complaint in the Circuit Court of Logan County, West
Virginia.  The complaint, which does not contain numbered counts,
states that "[t]he plaintiff asserts that her discharge from her
employment by the Defendant on July 18, 2008, is in violation of
public policy of the State of West Virginia."  (Compl. ¶ 7).  In
recompense for this alleged wrong, plaintiff seeks compensatory
and punitive damages, equitable relief, as well as costs and
attorney fees.  (Compl. Prayer for Relief ¶¶ 1-8).

13

CCBCC removed the action to this court on October 20, 2009.  CCBCC is a Delaware corporations, with a principal place of business in North Carolina.  (Not. of Removal ¶ 7).  Plaintiff is a resident of Logan County, West Virginia.  (Compl. ¶ 2). Because the parties are diverse, and the amount in controversy exceeds $75,000, (Not. of Removal ¶¶ 12-51), the court is possessed of diversity jurisdiction.  See 28 U.S.C. § 1332.  The parties do not contest jurisdiction.

II.

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant.  Id.  The moving

14

party has the burden of showing -- "that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial.  Fed. R. Civ. P. 56(c); id. at 322-23.  A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant.  Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party.  Anderson, 477 U.S. at 248.  Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute.  Overstreet v. Ky. Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991).

A court must neither resolve disputed facts nor weigh the evidence, Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility.  Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986).  Rather, the party opposing the motion is entitled to have his or her version of the

15

facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor.  <u>Charbonnages de France v. Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979).  Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).

### III.

The complaint does not set forth the nature of the public policy CCBCC allegedly violated when it discharged the plaintiff.  As a result, in CCBCC's memorandum in support of its motion for summary judgment the company assumes that plaintiff's claim is based on an alleged violation of the "right to marry."  (Mem. in Supp. Mot. Summ. J. at 9).  In light of this assumption, CCBCC argues that in enforcing the employment of relatives policy, and discharging the plaintiff, it did not contravene the public policy of West Virginia by infringing on the right to marry.

In response, plaintiff argues first that an issue of fact exists regarding whether the employment of relatives policy required that she be discharged.  Plaintiff argues next that she

16

was discharged because of her gender in violation of West
Virginia public policy and the West Virginia Human Rights Act
("WVHRA"), W. Va. Code §§ 5-11-1 through 21.  Plaintiff's final
contention is that the employment of relatives policy is not
narrowly tailored.

CCBCC begins its reply by pointing out that the
plaintiff has failed to clearly articulate the public policy
providing the basis for her claim that she was wrongfully
discharged.  CCBCC contends there is no issue of fact as to how
the employment of relatives policy is implemented in light of the
affidavit of Ms. Leary, and even if there were, because the
Employment Guide is not a contract, plaintiff's proffered
interpretation thereof is of no moment.  CCBCC argues that
because the complaint does not assert a claim under the WVHRA,
plaintiff's reliance thereon is untimely and misplaced.
According to CCBCC, even if the plaintiff had asserted a claim
under the WVHRA, she is unable to establish a prima facie case of
gender discrimination.

A. Wrongful Discharge

"In West Virginia, the law presumes that employment is

terminable at will, permitting an employer to discharge an employee for cause, for no cause, or even for wrong cause." Mace v. Charleston Area Med. Ctr. Found., Inc., 422 S.E.2d 624, 630 (W. Va. 1992); see also Feleciano v. 7-Eleven, Inc., 559 S.E.2d 713, 718 (W. Va. 2001) ("The practical effect of this doctrine, then, is that 'an at-will employee serves at the will and pleasure of his or her employer and can be discharged at any time, with or without cause.'") (quoting Kanagy v. Fiesta Salons, Inc., 541 S.E.2d 616, 619 (W. Va. 2000)). The at-will employment doctrine is not, however, absolute. In Harless v. First National Bank in Fairmont, 246 S.E.2d 279 (W. Va 1978) the West Virginia Supreme Court of Appeals crafted a "limited exception to the common law rule, that in the absence of a written contract containing a fixed term of employment, an employee . . . [can] be discharged for good reason, bad reason, or no reason at all." Collins v. Elkay Mining Co., 371 S.E.2d 46, 48 (W. Va. 1988). The court held:

> We conceive that the rule giving the employer the absolute right to discharge an at will employee must be tempered by the further principle that where the employer's motivation for the discharge contravenes some substantial public policy principle, then the employer may be liable to the employee for the damages occasioned by the discharge.

Harless, 246 S.E.2d at 275; see also Wounaris v. W. Va. State Coll., 588 S.E.2d 406, 412 (W. Va. 2003) (same); Page v. Columbia

18

Natural Res., Inc., 480 S.E.2d 817, 824 (W. Va. 1996) (same).
The Supreme Court of Appeals has referred to the tort cause of
action set forth in Harless as an action for "retaliatory" or
"wrongful" discharge.  Slack v. Kanawha County Hous. & Re-Dev.
Auth., 423 S.E.2d 547, 555 n.8 (W. Va. 1992) ("We have used the
term 'retaliatory discharge' as a shorthand term for an employee
discharge that contravenes some substantial public policy
principle . . . ."); Page, 480 S.E.2d at 821 (describing
plaintiff's cause of action as "a Harless wrongful discharge
action").

       Use of the phrase "substantial public policy" in
Harless was intended "to exclude claims that are based on
insubstantial considerations.  The term 'substantial public
policy' implies that the policy principle will be clearly
recognized simply because it is substantial."  Birthisel v. Tri-
Cities Health Servs. Corp, 424 S.E.2d 606, 612 (W. Va. 1992).
The Supreme Court of Appeals has explained that,

       [t]o identify the sources of public policy for purposes
       of determining whether a retaliatory discharge has
       occurred, we look to established precepts in our
       constitution, legislative enactments, legislatively
       approved regulations, and judicial opinions. . . .
       "Inherent in the term 'substantial public policy' is
       the concept that the policy will provide specific
       guidance to a reasonable person."

Kanagy, 541 S.E.2d at 620 (quoting Birthisel, 424 S.E.2d at 612).

19

"A determination of the existence of public policy in West
Virginia is a question of law, rather than a question of fact for
the jury."  Page, 480 S.E.2d at 823.  The Supreme Court of
Appeals has tempered the at-will employment doctrine by deeming,
for example, the right to privacy, the right to seek redress of
grievances and seek access to the courts, and the right to self
defense, to constitute substantial public policies.  See
Wounaris, 588 S.E.2d at 413 (collecting cases); see also Shell v.
Metro. Life Ins. Co., 396 S.E.2d 174, 180 (W. Va. 1990)
(collecting cases finding substantial public policies based on
legislative enactments).

          In order to recover for the tort of wrongful discharge,
the plaintiff must first establish the existence of a substantial
public policy.  See Wounaris, 588 S.E.2d at 248.  If a
substantial public policy is found to exist, the plaintiff must
then "establish by a preponderance of the evidence that . . .
[his or her] employment discharge was motivated by an unlawful
factor contravening that policy."  Id. (quoting Page, 480 S.E.2d
at 829).  If the plaintiff makes such a showing, "liability will
then be imposed on a defendant unless the defendant proves by a
preponderance of the evidence that the same result would have
occurred even in the absence of the unlawful motive."  Id.

(quoting <u>Page</u>, 480 S.E.2d at 829).


A. Marriage


The Supreme Court of Appeals has not had occasion to consider whether the "right to marry" embodies a substantial public policy. CCBCC nevertheless concedes that in West Virginia, protection of the institution of marriage constitutes a substantial public policy, and it seems likely that such a concession is warranted. <u>See</u> <u>State ex rel. Roy Allen S. v. Stone</u>, 474 S.E.2d 554, 569 (W. Va. 1996) (noting the "the importance of the traditional family unit . . . [and] the institution of marriage."); <u>Thomas v. LaRosa</u>, 400 S.E.2d 809, 814 (W. Va. 1990) ("Marriage is a central secular institution in this society."); <u>Gant v. Gant</u>, 329 S.E.2d 106, 113 (W. Va. 1985) ("The institution of marriage still confers substantial benefits on both the couple involved and society as a whole . . . ."); <u>see also</u> <u>Zablocki v. Redhail</u>, 434 U.S. 374, 383 (1978) ("the right to marry is of fundamental importance"). Even assuming, arguendo, that an employer who discharges its employee in contravention of the right to marry violates a substantial public policy of the state of West Virginia, no such violation has occurred here.

21

The plaintiff in <u>Townshend v. Board of Education</u>, 396 S.E.2d 185 (W. Va. 1990) worked as a public school teacher at Peterburg Elementary School for a number of years.  When his wife became the principal of the school, the Board of Education notified the plaintiff that he was to be transferred to another school in light of the Board's policy "prohibiting employment of immediate family members in an administrative-teacher relationship . . . ." <u>Townshend</u>, 396 S.E.2d at 187.  In reversing the decision of the lower court requiring the Board to rescind the transfer, the Supreme Court of Appeals stated at the outset that "the Board of Education properly adopted a policy with a laudatory purpose: preventing conflicts of interest and favoritism." <u>Id.</u> at 188.  The court noted that,

> anti-nepotism rules are standard practice and date back
> to the turn of the Century.  Today many private
> companies have anti-nepotism policies that restrict
> spouses from working under the same chain of command.
> A 1981 survey of 374 companies report that of the 82
> percent who would employ both husbands and wives, 74
> percent restrict spouses from working together in the
> same department or in the same function.  A 1985 survey
> of 115 companies reported that 46 percent prohibit
> supervision by a relative.

<u>Id.</u> (citing U. Sekran, <u>Dual-Career Families</u> (1986)).  Finding the Board to have properly exercised its discretion in transferring the plaintiff, the court held "that a board of education policy that prohibits one spouse from supervising the other spouse

within a county school system is a reasonable exercise of the
board's supervisory authority to prevent favoritism, conflicts of
interest or the appearance of either."  Id.

If a policy prohibiting the supervision of one spouse
over another does not offend the right to marry, neither does a
policy prohibiting a mother-in-law from supervising her son-in-
law.  To the extent either policy has a deleterious effect on the
institution of marriage, the effect is more attenuated in the
latter case.

Plaintiff's argument as to the interpretation of
CCBCC's employment of relatives policy is wide of the mark.
Plaintiff concedes that she was employed by CCBCC on an at-will
basis, (Resp. to Mot. Summ. J. at 6), and while the complaint is
far from a model of clarity, it is clear that a breach of
contract claim is not being asserted.[9]  Thus, whether the

_____

[9] Indeed, because she was an at-will employee plaintiff
could not have asserted a claim for breach of contract.  While
"an employee handbook may form the basis of a unilateral contract
if there is a definite promise therein by the employer not to
discharge the covered employees except for specified reasons,"
the CCBCC Employment Guide contains no such promise.  Mace, 422
S.E.2d at 630. Further, the Employment Guide contains a clear
disclaimer, in capital letters, stating that "[t]he contents of
this document are not intended to create a contract between the
company and any employee."  (CCBCC Employment Guide at 4, Reply
to Resp. to Mot. Summ. J., Ex. 1).  The West Virginia Supreme
Court of Appeals has explained that "[a]n employer may protect

23

employment of relatives policy is narrowly drawn, or whether the policy in fact called for plaintiff's discharge, is of little moment.  Even if the policy did not require her discharge, as an at-will employee plaintiff was subject to discharge "for cause, for no cause, or even for wrong cause."  Mace, 422 S.E.2d at 630.

In a wrongful discharge action the question is whether "a forbidden intent was a motivating factor in the adverse employment action."  Page, 480 S.E.2d at 829.  According to Ms. Leary, "the Employment of Relatives policy effectively disallows the supervision of one relative by the other."  (Leary Aff. ¶ 7, Mot. Summ. J., Ex. 4).  If consistent with such an understanding of the policy, plaintiff was fired because she became the supervisor of her son-in-law, CCBCC was not motivated by "a forbidden intent" and plaintiff's claim fails.  Plaintiff's discharge thus did not violate a substantial public policy of the state of West Virginia founded in the right to marry.

---

itself from being bound by any and all statements in an employee handbook by placing a clear and prominent disclaimer to that effect in the handbook itself."  Mace, 422 S.E.2d at 630 (quoting Souter v. Harsco Corp., 403 S.E.2d 751 (W. Va. 1991)).

B. Gender


        The complaint is devoid of any allegation that the
plaintiff was discharged because of her gender.  The complaint
also fails to reference the WVHRA.  Yet, in her response to
CCBCC's motion for summary judgment plaintiff asserts that "she
was treated disparately by the Defendant," (Resp. to Mot. Summ.
J. at 2), and that "regardless of her status as an at-will
employee, the Defendant's termination of Ms. Caudill was
violative of the West Virginia Human Rights Act and the Public
Policy of West Virginia as the Defendant treats white, male
employees differently."  (Id. at 6).  CCBCC argues that
plaintiff's assertion of gender discrimination is untimely and
should therefore be disregarded.  (Reply to Resp. to Mot. Summ.
J. at 12).  Indeed, "[a] plaintiff may not amend her complaint
through argument in a brief opposing summary judgment."  Gilmour
v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004)
(citing Shanahan v. City of Chicago, 82 F.3d 776, 781 (7th Cir.
1996)).

        The complaint states, "[t]he plaintiff asserts that her
discharge from her employment by the Defendant on July 18, 2008,
is in violation of public policy of the State of West Virginia."

                               25

(Compl. ¶ 7).  Plaintiff's reference to "violation of public policy" clearly indicates that her claim is in tort for wrongful discharge; in no event can the complaint, which fails to even mention the WVHRA, be read to include a claim under the WVHRA.[10] To the extent plaintiff contends that she was wrongfully discharged because of her gender, she bears the burden of proving that her gender was a motivating factor in CCBCC's decision to end her employment.  See Wounaris, 588 S.E.2d at 413 (holding that plaintiff in wrongful discharge action must "establish[] by a preponderance of the evidence that an employment discharge was motivated by an unlawful factor.").

     According to the plaintiff, because four sets of two related male employees worked at CCBCC at the same time without

---

[10] It has not been demonstrated that plaintiff could even bring a claim for gender discrimination under the WVHRA inasmuch as it has not been shown that CCBCC falls within the Act's definition of "employer."  See W. Va. Code §§ 5-11-3(d).  The West Virginia Supreme Court of Appeals has held that the WVHRA embodies a substantial public policy against gender discrimination.  See Williamson v. Greene, 490 S.E.2d 23, 32 (W. Va. 1997).  In Williamson, the court determined that though the plaintiff did not have a claim under the WVHRA because her former employer did not fall within the Act's definition of "employer," she could nevertheless maintain a common law action for wrongful discharge based on the employer's alleged gender discrimination. Id. at 33.  While this court has held that "a Harless -type action may not be substituted for an action under the West Virginia Human Rights Act," Guevara v. K-Mart Corp., 629 F. Supp. 1189, 1192 (S.D. W. Va. 1986), the Supreme Court of Appeals has not addressed the issue.

being discharged, and because she was fired as opposed to Mr

Evans, "the Defendant clearly does not apply its anti-nepotism

policy evenhandedly to men and women." (Resp. to Mot. Summ. J.

at 8). Ralph Fink, Jerry Wriston and Scott Pickens all testified

that they worked at CCBCC at the same time as their brothers-in-

law and that they suffered no adverse employment action as a

result. (Fink Dep. at 9, Reply to Resp. to Mot. Summ. J., Ex. 6;

Wriston Dep. at 7, Reply to Resp. to Mot. Summ. J, Ex. 10;

Pickens Dep. at 8, Reply to Resp. to Mot. Summ. J., Ex. 11).

None of these men, however, ever supervised, or was supervised

by, his brother-in-law. (Fink Dep. at 11, Reply to Resp. to Mot.

Summ. J., Ex. 6; Wriston Dep. at 13, Reply to Resp. to Mot. Summ.

J, Ex. 10; Pickens Dep. at 13, Reply to Resp. to Mot. Summ. J.,

Ex. 11). Mr. Thacker testified that Harold McVey and Mike

Shamblin worked together at CCBCC despite being brothers-in-law.

(Thacker Dep. at 15, Resp. to Mot. Summ. J., Ex. H). While

according to Mr. Thacker, the two men never supervised each

other, (Id. at 15-20), CCBCC concedes that Mr. Shamblin "directly

reported" to Mr. McVey between March 1, 2003 and January 3, 2005,

and again from March 1, 2005 through July 31, 2008. (Mem. in

Supp. Mot. Summ. J. at 13 n.2; Reply to Resp. to Mot. Summ. J. at

15).

27

The fact Messrs. Fink, Wriston and Pickens worked together is unremarkable.  In her affidavit, Ms. Leary explained that, "[i]n its practical application, the Employment of Relatives policy effectively disallows the supervision of one relative by the other." (Leary Aff. ¶ 6-7, Mot. Summ. J., Ex. 4). Despite plaintiff's contention that Ms. Leary's affidavit should be disregarded because it is "self-serving" and "without factual support in the record," (Resp. to Mot. Summ. J. at 5), simply because an affidavit supports a party's theory of the case does not mean it is of no evidentiary value.  In any event, there is support in the record for Ms. Leary's explanation of how the employment of relatives policy is applied.  Mr. Fink testified that his understanding of the policy was, "if you are in direct supervision of a relative, that there is a policy against that." (Fink Dep. at 8, Reply to Resp. to Mot. Summ. J., Ex. 6).  Most importantly, plaintiff has not submitted any evidence that, in any other case, the policy was applied differently.

While plaintiff does not address CCBCC's concession that Mr. Shamblin reported to Mr. McVey at two different times for a total period of approximately five years and three months, this singular instance of a male employee supervising his male relative does not undermine Ms. Leary's explanation of how the

28

employment of relatives policy is applied.  Nor does it alone
show that female employees such as the plaintiff were treated
differently because of their gender.  Viewing the evidence in the
light most favorable to the plaintiff, it is simply unreasonable
to infer that because one male employee supervised his relative,
plaintiff was fired because of her gender.

        The unreasonableness of the inference is made clear by
the plaintiff's own statements.  Plaintiff testified that she did
not believe she was treated differently because of her gender
when she worked at CCBCC.  (Caudill Dep. at 87, Mot. Summ. J.,
Ex. 2).  Plaintiff also testified that when she worked at CCBCC
she never had any problems with a supervisor or manager and that
she liked working at CCBCC "very much."  (Id. at 56).  On the
exit interview form plaintiff expressed that she was generally
satisfied with her experience working at CCBCC.  (7/17/08 Exit
Interview Form, Reply to Resp. to Mot Summ. J., Ex. 9).
Plaintiff's only source of dissatisfaction was "the company
policy that cost me my job."  (Id.)  In the statement she
submitted to Workforce West Virginia plaintiff explained why she
was discharged, without the slightest intimation that it was
because of her gender.  (7/22/08 Workforce Statement, Mot. Summ.
J., Ex. 5).  Plaintiff's last ditch effort to impugn the motives

29

of CCBCC is based on nothing but conjecture, is inconsistent with plaintiff's own statements, and is inconsistent with the other evidence of record.

Finally, that the plaintiff was discharged, as opposed to Mr. Evans, does not show that plaintiff was treated disparately because of her gender.  In her statement to Workforce West Virginia plaintiff explained that Mr. Evans "has been there longer and is a union member.  For these reasons . . . [CCBCC] said they had to let me go."  (7/22/08 Workforce Statement, Mot. Summ. J., Ex. 5).  Similarly, plaintiff's resume states that Mr. Evans, "had been here longer and was a union employee and I was the one that the company had to let go."  (Resume, Reply to Resp. to Mot. Summ. J., Ex. 8; Caudill Dep. at 90, Mot. Summ. J., Ex. 2).  Consistent with these statements, during her deposition plaintiff agreed that "[m]anagers like yourself have more responsibilities but the [union] employees had more job security because of . . . [the union] contract."  (Caudill Dep. at 35, Mot. Summ. J., Ex. 2).  The reasonable inference - the one to which plaintiff's own statements lend credence - is that Mr. Evans was retained as an employee, not because of his gender or hers, but because he was the more senior employee and a member of the union.

Plaintiff's allegations of gender discrimination, raised for the first time in her memorandum in response to the motion for summary judgment, are baseless.  Simply because plaintiff is a woman and was fired, does not of itself show that she was fired because she is a woman.  Plaintiff has not offered sufficient evidence for a jury to return a verdict in her favor.  See Anderson , 477 U.S. at 250 ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.").  The motion for summary judgment is granted.

IV.

It is according ORDERED that the motion of CCBCC for summary judgment be, and it hereby is, granted.

The Clerk is directed to forward copies of this memorandum opinion and order to all counsel of record.

DATED:  August 17, 2009

John T. Copenhaver, Jr.
United States District Judge

31